Commonwealth v. Pina.

## COMMONWEALTH vs. STEPHEN PINA.

Suffolk. September 8, 1999. - October 20, 1999.

Present: ABRAMS, LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Practice, Criminal,* Argument by prosecutor, Instructions to jury, Capital case. *Evidence,* Cross-examination, Consciousness of guilt, Failure to produce witness. *Identification. Homicide.*

At a murder trial, there was no error in the prosecutor's remarks in closing argument praising witnesses' courage in testifying against the defendant, where the prosecutor did not personally vouch for, or comment from personal knowledge on, the credibility of a witness, and where ample evidence existed to support the prosecutor's characterization of pervasive fear in the area in which the crime took place. [269-270]

At a criminal trial, the judge did not, in the circumstances, abuse his discretion in limiting the cross-examination of one witness for the Commonwealth as to whether he expected to receive favorable treatment on pending court matters in exchange for his testimony; nor did the judge err in prohibiting defense counsel from asking a second witness about certain prior testimony offered to impeach the witness where, as the prior testimony was not contradictory, it was within the judge's discretion to exclude it. [270-271]

At a criminal trial, the judge's consciousness of guilt instruction and comment that the "defendant" had fled, although inappropriate where the only contested issue was identification and there was no dispute that the person fleeing the scene of the crime was the same as the assailant, did not constitute reversible error given the context of the instruction and the judge's other remarks on the subject. [271-273]

At a criminal trial, a judge did not err, or abuse his discretion, by refusing to give a consciousness of innocence instruction. [273]

At a criminal trial, there was no merit to the defendant's contention that a curative instruction given by the judge following the prosecutor's closing argument constituted a "missing witness" instruction. [273-274]

Where deliberate premeditation was not a live issue at the trial of a first degree murder case, the judge's instruction to the jury giving examples of deliberate premeditation closely paralleling the facts of the case did not prejudice the defendant. [274-275]

INDICTMENT found and returned in the Superior Court Department on October 27, 1993.

The case was tried before *James D. McDaniel, Jr.,* J.

*Stephen Neyman* for the defendant.

*Rosemary Daly,* Assistant District Attorney (*Robert Tochka,* Assistant District Attorney, with her) for the Commonwealth.

IRELAND, J. This case arises from a February 26, 1993, shooting death in the Mission Hill housing development in Boston. According to evidence presented at trial, both the victim and the defendant had been involved in distributing drugs in and around the Mission Hill development.[1] The defendant relied on a defense of misidentification. The jury convicted the defendant of unlawful possession of a firearm and murder in the first degree on a theory of deliberate premeditation. On appeal, the defendant argues that (1) the prosecutor exceeded the bounds of permissible argument during his closing; the judge erred in (2) limiting his cross-examination; (3) instructing the jury on the consciousness of guilt over his objection; (4) refusing to provide a consciousness of innocence instruction; (5) providing a missing witness instruction; and (6) providing the jury with examples of deliberate premeditation that were similar to the facts adduced at trial. Finally, the defendant asks the court, pursuant to G. L. c. 278, § 33E, to reverse his murder conviction and order a new trial. We affirm the convictions and see no reason to reduce the murder verdict or grant a new trial.

We summarize the evidence. The defendant and Thomas Davis sold drugs in the Horadan Way area of the Mission Hill section of Boston. On February 26, 1993, Linda Taylor, who sold drugs for the defendant, met him and Davis in Davis's apartment to pick up some heroin. While in the apartment, Taylor overheard the defendant tell Davis that "this is the day I'm going to set an example to everyone that owes me. I want my money." At the time, the defendant was carrying a gun in his waistband.

Later that evening, at approximately 8:30 P.M., Debra Rocher Annas and her friend, "Mickey," went to 31 Horadan Way to purchase heroin. While outside, Rocher Annas approached the victim, Keith Robinson, who was standing in a group of fifteen to twenty-five people, and asked him for heroin. At approximately 9 P.M., a maroon vehicle driven by Demetrius Burton stopped near the group. The defendant, who had been dressed in dark clothing, got out of the vehicle and approached

---

[1]The defendant did not challenge the fact that the prosecutor characterized him as a drug dealer.

the victim. The defendant and the victim argued. Rocher Annas heard them mention money, a ring, drugs, and "business."

After this confrontation, the defendant returned to the vehicle, reached into the passenger's side and retrieved a gun. The defendant then walked quickly back to the victim "rapping" the words, "give me your shit or I'll bust you with my click." When he reached the victim, the defendant grabbed him by the lapel or collar and fired at least four shots at him. The defendant then fled in the direction of McGreevey Way. Police officers later retrieved the gun from a snow bank on McGreevey Way.[2] Timothy Hall, another bystander, testified as an eyewitness for the Commonwealth and corroborated Rocher Annas's account of the shooting.

Two days after the shooting, the defendant went to the Area B-2 police station and asked to speak with Officer James O'Loughlin of the Boston Housing Authority police, who had been assigned to the Mission Hill development. The defendant asked Officer O'Loughlin why he was looking for him. The defendant told the officer that, although he may have been present at the scene of the shooting, he did not shoot the victim. The defendant also inquired whether officers had recovered the gun and whether they had examined it for fingerprints.

On March 15, 1993, Officer O'Loughlin saw the defendant standing in the area of 68 Horadan Way and pulled his police cruiser alongside him. Officer O'Loughlin said that he had heard that the defendant wanted to take a "pot shot" at him. The defendant replied that O'Loughlin saw what he had done down there (pointing in the vicinity of Horadan Way) and that "nothing came of that." The defendant then walked back to his maroon Chevrolet and drove away.

A few months after the murder, police officers questioned Rocher Annas about the murder. She told officers that she had been present at the scene of the murder. Approximately one month later, police officers staged an arrest of Rocher Annas at a "crack house" and transported her to the homicide unit to

---

[2]Tonya Murphy, a resident of 19 McGreevey Way, testified that, shortly after she heard gunshots, she observed a heavy-built, stocky, light-skinned male running with his hand under his sweatshirt. As he approached her building, this individual slipped on ice and fell. A gun fell from his sweatshirt. The individual then resumed his flight without retrieving his gun. Ballistics testing confirmed that the gun found in the snow bank had been used to shoot the victim.

meet with the detective assigned to this homicide. Rocher Annas then selected the defendant's photograph from an array as someone that she "knew." At a later date, however, Rocher Annas identified the defendant as the shooter.

1. *The Commonwealth's closing argument.* The defendant claims that the prosecutor exceeded the bounds of proper argument in two ways during the closing. First, the defendant cites the prosecutor's praise of the Commonwealth's key witnesses' "courage" in testifying against the defendant, a known drug dealer, when approximately fifteen to twenty-five other witnesses failed to cooperate with the investigation. Second, the defendant claims that the prosecutor crossed into impermissible argument by casting the neighborhood where the murder occurred in an unfavorable light as a high crime area saturated with drug activity, where potential witnesses were afraid of cooperating with police. At the close of the Commonwealth's argument, defense counsel moved for a mistrial on the grounds that the prosecutor unfairly commented on the credibility of a number of witnesses and suggested that the other witnesses did not come forward out of fear of the defendant. The judge denied the motion. While close to the borderline between permissible and impermissible statements, the prosecutor's argument was based on evidence in the case. In addition, the trial judge's curative instruction prevented reversible error.

Because the defendant claimed misidentification, the case turned on the credibility of the Commonwealth's witnesses. As his theme, the prosecutor suggested that the Commonwealth's witnesses were credible, arguing that it took great courage for them to come forward to testify against a known drug dealer. To illustrate this theme, the prosecutor stressed the dangerousness of the area and the risks involved with testifying against a drug dealer. He also implied that the other witnesses who allegedly witnessed the murder did not come forward because of fear in the housing development and fear of the defendant.

We have recognized that a prosecutor may argue that it took "courage" or "character" for a witness to testify. See *Commonwealth* v. *Jackson*, 428 Mass. 455, 461 (1998) (holding no error in prosecutor's remark in closing argument commenting on witnesses' reasonable fear in testifying against defendant); *Commonwealth* v. *Lapointe*, 402 Mass. 321, 331 (1988). Also, the prosecutor did not personally vouch for, or comment from personal knowledge on, the credibility of a witness.

Second, ample evidence existed to support the prosecutor's characterization of pervasive fear in the Mission Hill housing development. For example, Timothy Hall testified that he asked the police to "get [him] out of there" at the time of the shooting because it was "a pretty tense situation," and later stated that he became scared on viewing a picture of the defendant in a photographic array. Both Rocher Annas and Taylor testified to the existence of an extensive drug trade on Horadan Way, and Rocher Annas stated that she was "nervous" about becoming involved in a murder case. Rocher Annas further testified that she did not speak to the police on the night of the shooting, because "[y]ou don't run to the police in the projects." Police officers staged an arrest of Rocher Annas from a drug house to protect her safety, and Detective John McCarthy testified that Rocher Annas later admitted that she was "afraid" to identify the person who shot the victim.

The prosecutor's closing argument permissibly included references to fear in the Mission Hill development because those comments were based on the evidence provided by the Commonwealth's witnesses. See *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 418-421 (1978) (holding that arguments about witness's fear of testifying and about pervasive fear in a housing development in Charlestown were permissible if grounded in evidence). Here, the prosecutor argued that it was fear, rather than uncertainty, that contributed to the eyewitnesses' initial failure to identify the defendant as the shooter.[3] And in any case, any potential for harm from the prosecutor's argument was cured by the judge's instruction.

We are more troubled by portions of the argument that alluded to the victim's family life and a videotape, not in evidence, of blood surrounding the victim. These references, however, were isolated. See *Commonwealth* v. *Mitchell,* 428 Mass. 852, 857 (1999) (holding that, although prosecutor improperly appealed to jury's sympathy by commenting on victim, remarks were isolated and were not significant or focal portion of prosecutor's closing).

2. *Limitation of cross-examination.* The judge did not abuse his discretion in limiting the cross-examination of two witnesses

---

[3]Contrast *Commonwealth* v. *Ward,* 28 Mass. App. Ct. 292, 294-297 (1990) (holding that prosecutor impermissibly played on jury's emotions and pandered to fears by "sound[ing] a persistent theme that [they] had a duty to confront crime in the streets bravely and to avenge the wrong done the victim").

for the Commonwealth, Hall and Taylor. As to Hall, defense counsel attempted to question him about a pending motion to revise and revoke a sentence that he received for a 1994 armed robbery conviction, and whether he expected to receive favorable treatment on the motion in exchange for his testimony. The judge limited this inquiry on the ground that Hall's postsentencing conduct could not be considered by the motion judge or have any impact on the judge's decision. See, e.g., *Commonwealth* v. *Barclay*, 424 Mass. 377, 380 (1997); *Commonwealth* v. *Layne*, 386 Mass. 291, 295-296 (1982). Because Hall could not have anticipated or expected favorable action in response to his testimony, questioning on this subject was irrelevant.

Also, the defendant was not prejudiced by a lack of questioning about a scheduled probation surrender hearing, where (a) Hall testified on direct examination concerning his armed robbery conviction and the fact that he was still on probation, (b) Hall testified that he had not asked for or expected to be rewarded in return for his testimony, and (c) defense counsel impeached Hall with all his prior convictions.[4]

The judge also did not err in prohibiting defense counsel from impeaching Taylor, the witness who overheard the defendant telling an acquaintance on the day of the murder that he was going to set an example to everyone who owed him, with a statement that she made during a hearing in March of 1995. The defendant claimed that Taylor had stated that the conversation she had overheard occurred either one month after or one month before the day of the murder. During cross-examination Taylor denied ever having stated that this conversation took place on another date.

It is unclear whether the prior testimony that the defendant offered to impeach Taylor concerned the same conversation that Taylor said occurred on the day of the murder. As the prior testimony was not contradictory, it was within the judge's discretion to exclude it. *Commonwealth* v. *Hesketh*, 386 Mass. 153, 161 (1982).

3. *Consciousness of guilt instruction.* The defendant concedes that the judge's instruction on consciousness of guilt complied

---

[4]According to the Commonwealth, although the judge initially denied the defendant's request to question Hall about the probation surrender hearing, he invited the defendant to revisit the matter if he could provide the court with favorable case law on the subject. The defendant did not revisit the issue.

with the standards set forth in *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982). Citing *Commonwealth* v. *Groce*, 25 Mass. App. Ct. 327 (1988), he claims that the judge should not have provided such an instruction because the defense was misidentification.[5] He also challenges the judge's comment that "[b]ut for reasons and purposes of discussing this principle, as I recall, there was evidence offered in this case to the effect that *the defendant* sometime following the death of [the victim] fled from the scene of his killing" (emphasis added). The defendant argues that the judge may have conveyed a notion that he believed that the witness's identification was accurate.

It would have been best had the judge not given the consciousness of guilt charge. In *Groce*, the Appeals Court, in reversing a conviction of unarmed robbery, recognized that a consciousness of guilt instruction is inappropriate where, as in this case, identification is at issue and there is no question that the criminal incident actually occurred. As the Appeals Court reasoned, there is no rationale for a consciousness of guilt instruction where the only contested issue is identification and there is no dispute that the person fleeing the scene of the crime was the same as the assailant. *Id.* at 331-332.

This case, however, is distinguishable from *Groce*. Here, the judge took additional steps to stress to the jury that, by providing this instruction, he was not commenting on the evidence or implying that the defendant was the shooter. Immediately before providing this instruction, the judge emphasized that "the burden of proof on the prosecutor extends to every element of the crime charged and this specifically includes the burden of proving beyond a reasonable doubt [the] identity of the defendant as the perpetrator of the crime with which he stands charged." The judge also reminded the jury that, as to the issue of consciousness of guilt, if he discussed any evidence it was "only to illustrate a legal principle and for no other reason. And if your recollection doesn't comport with mine please disregard my recollection entirely."[6]

The judge's noting at one point during the jury instructions

---

[5]The defendant objected to this instruction before the charge.

[6]Cf. *Commonwealth* v. *Brown*, 414 Mass. 123, 126-127 (1993) (holding that at a murder trial where identification had been at issue, although the judge should not have referred to flight from the scene as an example of consciousness of guilt because of the absence of any such flight in the facts of that case, the error was not prejudicial given the context of the entire charge, the judge's

ıat the "defendant" had fled did not constitute reversible error. Although it would have been better practice had the judge consistently stated that there was evidence that the "shooter" or "assailant" had fled from the scene, this solitary misstatement did not constitute reversible error given its context and the judge's other remarks on this subject.

4. *Consciousness of innocence instruction.* The evidence indicated that the defendant voluntarily went to the police station to talk to police officers about the murder. The judge declined to give a consciousness of innocence instruction at the defendant's request on the ground that there is "no such animal."[7] We previously have not required that a judge give a consciousness of innocence instruction. See, e.g., *Commonwealth* v. *Hartford*, 425 Mass. 378, 380 (1997); *Commonwealth* v. *Oeun Lam*, 420 Mass. 615, 619-620 (1995); *Commonwealth* v. *Knap*, 412 Mass. 712, 716-717 (1992).

The defendant now invites us to revisit the question, relying on art. 12 of the Massachusetts Declaration of Rights to the effect that "every subject shall have a right to produce all proofs, that may be favorable to him" and "to be fully heard in his defence by himself, or his counsel, at his election." The defendant also relies on a dissenting opinion in *United States* v. *Scheffer*, 523 U.S. 303, 331 (1998) (Stevens, J., dissenting), which recognized that on occasion evidence of consciousness of innocence may be relevant to the central issues at trial.

We hold that "[c]onsciousness of innocence is a subject properly left to the give and take of argument, without jury instructions."[8] *Commonwealth* v. *Oeun Lam*, supra at 619. A judge does not err, or abuse discretion, by refusing to give a consciousness of innocence instruction.

5. *"Missing witness" instruction.* The defendant also challenges the curative instruction that the judge gave following the Commonwealth's closing and claims that it constituted a "missing witness" instruction. In essence, a missing witness instruc-

admonition that the jury could rely on any example of consciousness of guilt only if they found that evidence existed of it in this case, and the absence of any argument by the prosecutor concerning evidence of flight).

[7]The defendant objected to the judge's failure to provide this instruction.

[8]During his opening statement and closing argument, defense counsel emphasized that the defendant voluntarily went to the police station and talked with the police and that such conduct was consistent with that of an innocent person.

tion tells the jury that they may infer that a party decided not to call a known and available witness to the stand because the witness's testimony would have been unfavorable to that party's case. See *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). Specifically, the defendant takes issue with the judge's instruction that, "[i]f there's any such evidence [as to what the nature of the neighborhood was or was not], you may consider any such evidence and any inferences that can be drawn, that you may draw from any such evidence on the issue of whether or not it [affected] or did not affect whether or not a person testified or didn't testify in this case."[9]

Although this instruction may have been somewhat confusing to the jury, it is not a missing witness instruction. As distinguished from *Commonwealth* v. *Schatvet, supra,* here the judge did not refer to any known or available witness or suggest that testimony from other witnesses at the scene of the murder would have prejudiced the defendant. Rather, the instruction, read in context, instructed the jury that it was for them to consider the evidence in the case and any reasonable inferences from that evidence as to why a person did or did not testify.

6. *Examples of deliberate premeditation.* The defendant also challenges the examples of deliberate premeditation that the judge used in his charge and in response to a question by the jurors.[10] The defendant argues that the judge's examples so closely paralleled the facts of this case that he invaded the province of the jury.

Although the examples the judge chose bore some resemblance to the facts of this case, he did not err in giving the instruction. Premeditation was not a contested issue in this case. In both the defendant's opening and closing statements it was conceded that this was a brutal killing and the only question was one of identification. While a "defendant's theory of his case cannot relieve the Commonwealth of its burden of proving every element of a crime beyond a reasonable doubt," whether

---

[9]The defendant objected to the instruction on the ground that there was no evidence of people not testifying.

[10]The judge instructed the jury as follows: "The jury may also consider the defendant's conduct prior to the alleged killing as relevant to the issue of deliberate premeditation. For example, evidence that a defendant, after a quarrel, went to a bedroom, picked up a gun and returned to shoot a victim or that a defendant fired a second shot at a disabled victim would be such conduct that may be considered on the issue of deliberate premeditation."

an issue was contested at trial "is highly relevant to our determination" whether the judge's charge caused prejudice to the defendant. *Comonwealth* v. *Shea*, 398 Mass. 264, 269 (1986). Because premeditation was not a live issue, the instruction did not harm the defendant.

Furthermore, the defendant concedes that this instruction "allowed the jury to draw a permissive inference as opposed to a mandatory presumption." A reasonable juror could not have interpreted the instruction as a conclusive directive by the judge on the issue of deliberate premeditation. This case, therefore, is distinguishable from *Commonwealth* v. *Skinner*, 408 Mass. 88, 93-96 (1990), in which we held that a supplemental instruction on the element of deliberate premeditation improperly relieved the Commonwealth of its burden of proof and was not cured by the judge's main charge.

7. *Plenary review.* The defendant's arguments under G. L. c. 278, § 33E, focus on the same claims that we previously have addressed. We affirm the murder conviction and see no reason to reduce the murder verdict or grant a new trial.

*Judgments affirmed.*